# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-IA-01096-SCT

*SINGING RIVER HEALTH SYSTEM, JENNIFER
THOMAS-TAYLOR, M.D., ALVA BRITT, R.N.,
BENJAMIN W. HUDSON M.D., AND
EMERGENCY ROOM GROUP, LTD.*

*v.*

*TERESA VERMILYEA AND JULIE VERMILYEA
KASBY AS THE WRONGFUL DEATH
BENEFICIARIES OF RANDY VERMILYEA AND
JULIE VERMILYEA KASBY, INDIVIDUALLY*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/11/2016 |
| TRIAL JUDGE: | HON. ROBERT P. KREBS |
| TRIAL COURT ATTORNEYS: | JAMES E. LAMBERT, III |
| | JOHN A. BANAHAN |
| | JESSICA B. McNEEL |
| | A. KELLY SESSUMS, III |
| | MARC L. BOUTWELL |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN A. BANAHAN |
| | JESSICA B. McNEEL |
| | MICHAEL R. MOORE |
| | BRETT K. WILLIAMS |
| | A. KELLY SESSUMS, III |
| | JAMES E. LAMBERT, III |
| ATTORNEY FOR APPELLEES: | MARC L. BOUTWELL |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED AND REMANDED - 03/15/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., KING AND CHAMBERLIN, JJ.**

**KITCHENS, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Teresa Vermilyea and her daughter, Julie Vermilyea Kasby, filed suit against Singing River Health System, Jennifer Thomas-Taylor, M.D.; Alva Britt, R.N.; Benjamin W. Hudson, M.D.; and Emergency Room Group, Ltd., pursuant to the Mississippi Tort Claims Act for the wrongful death of Randy Vermilyea, the husband of Teresa Vermilyea and father of Julie Vermilyea Kasby (collectively, "Vermilyea"). Vermilyea alleged that Randy Vermilyea had been admitted to the Singing River Hospital following a suicide attempt and that the defendants had breached the standard of care by failing to assess his mental condition properly and prematurely discharging him, proximately causing his suicide minutes after his discharge. Julie Vermilyea Kasby, who had witnessed her father's suicide, asserted a claim for intentional infliction of emotional distress. The trial court denied the defendants' motions to dismiss for failure to state a claim. The appellants timely sought, and we granted, an interlocutory appeal. Finding that Vermilyea did state viable legal claims based upon Randy Vermilyea's death, we affirm and remand the case to the Circuit Court of Jackson County for further proceedings.

**FACTS**

¶2.     Vermilyea filed a complaint on October 8, 2015, and an amended complaint on November 13, 2015.[1] According to the amended complaint, on October 12, 2014, a severely depressed and suicidal Randy Vermilyea was standing on the ledge of the Pascagoula River Bridge, threatening to jump to his death. The amended complaint alleged that officers of the Jackson County Sheriff's Department arrived and spent ninety minutes pleading with him to

_____

[1] The amended complaint added Emergency Room Group, Ltd., as a defendant.

2

leave the bridge. The amended complaint further alleged that, when Randy Vermilyea finally agreed to step off the bridge, the officers took him into custody and had him transported by ambulance to the emergency room at Singing River Hospital, where he was evaluated and released a few hours later. According to the allegations of the amended complaint, Randy Vermilyea was evaluated by defendants Jennifer Thomas-Taylor, M.D.; Benjamin W. Hudson, M.D.; and Alva Britt, R.N.; and then he was released from the hospital on his own, without shoes, and without hospital employees' having contacted any of his family members to inform them of his suicide attempt. The amended complaint alleged that, upon his discharge, Randy Vermilyea telephoned his daughter, Julie Vermilyea Kasby, for transportation, and the defendants never informed her of his suicide attempt. Finally, the amended complaint alleged that, within minutes of his discharge, Randy Vermilyea jumped to his death from a bridge in Moss Point on Highway 613.

¶3.     In the amended complaint, Vermilyea alleged that the defendant medical providers had a duty to their patient, Randy Vermilyea, to exercise such reasonable care and attention as his mental and emotional condition required. Vermilyea claimed that the defendants had breached the standard of care by failing to conduct an adequate suicide assessment because, if one had been conducted, Randy Vermilyea would not have been discharged from the hospital prematurely. Vermilyea claimed that the failure to take adequate measures to assess Randy Vermilyea's mental state and keep him hospitalized proximately had caused his suicide immediately after his discharge. The amended complaint charged that the defendants had failed to assess and treat Randy Vermilyea's psychiatric condition, failed to hospitalize

3

him, negligently and prematurely released him from the hospital, failed to take reasonable steps to prevent him from harming himself, failed to follow the standard of care applicable to a depressed and suicidal patient, and failed to inform Theresa Vermilyea or Julie Vermilyea Kasby of his attempted suicide and need for follow-up care. The amended complaint also alleged that the physicians and nurse had failed to recognize the definitive signs and symptoms of Randy Vermilyea's medical condition. Vermilyea claimed that Singing River Health System and Emergency Room Group, Ltd., were vicariously liable for the negligent acts and omissions of their employees. Additionally, Julie Vermilyea Kasby asserted a claim for intentional infliction of emotional distress based on her having witnessed her father's suicide after the defendants had omitted informing her that he had attempted suicide earlier in the day.

¶4.    Singing River Health System and Jennifer Thomas-Taylor, M.D., answered and filed a motion to dismiss for failure to state a claim upon which relief could be granted pursuant to Rule 12(b)(6) of the Mississippi Rules of Civil Procedure. Dr. Benjamin Hudson and Emergency Room Group, Ltd., filed an answer and a joinder in Singing River's and Dr. Thomas-Taylor's motion to dismiss. Alva Britt, R.N., filed an answer and affirmative defenses in which she moved to dismiss the amended complaint for failure to state a claim. The defendants asserted that Vermilyea had failed to state a claim because, under ***Truddle v. Baptist Memorial Hospital-DeSoto, Inc.***, 150 So. 3d 692 (Miss. 2014), recovery against a third party for a suicide is permitted only upon proof that the decedent had acted under an irresistible impulse, proximately caused by the defendant's intentional conduct, that had

4

rendered him unable to discern the nature or consequences of suicide. Because Vermilyea's amended complaint alleged negligence, not that the defendants had committed an intentional act that had proximately caused an irresistible impulse in Randy Vermilyea to commit suicide, the defendants argued that the amended complaint should be dismissed for failure to state a claim.

¶5.     After a hearing, the trial court denied the motion to dismiss, finding the case to be distinguishable from *Truddle*. The defendants jointly filed a petition for an interlocutory appeal of the denial of the motion to dismiss. This Court granted the petition and stayed the proceedings in the trial court.

**STANDARD OF REVIEW**

¶6.     A motion to dismiss for failure to state a claim under Rule 12(b)(6) raises an issue of law which we review *de novo*. *City of Vicksburg v. Williams*, 191 So. 3d 1242, 1244 (Miss. 2016). A Rule 12(b)(6) motion tests the legal sufficiency of the complaint, and review is limited to the content of the complaint. *State v. Bayer Corp.*, 32 So. 3d 496, 502 (Miss. 2010). "On a motion to dismiss, 'the allegations in the complaint must be taken as true, and the motion should not be granted unless it appears beyond doubt that the plaintiff will be unable to prove any set of facts in support of his claim.'" *Covington Cty. Bank v. Magee*, 177 So. 3d 826, 828 (Miss. 2015) (quoting *City of Belmont v. Miss. State Tax Comm'n*, 860 So. 2d 289, 295 (Miss. 2003)).

## DISCUSSION

**WHETHER THE TRIAL COURT ERRED BY DENYING THE MOTION TO DISMISS.**

¶7.     The defendants argue that, taking the allegations of the complaint as true, ***Truddle v. Baptist-Memorial Hospital-DeSoto***, 150 So. 3d 692, is an absolute bar to Vermilyea's ability to recover for the suicide of Randy Vermilyea. ***Truddle*** involved Diane Truddle's claim against an internist and Baptist Hospital for the wrongful death of her son, Eric Carmichael, who had committed suicide after having been discharged from Baptist. ***Id.*** at 693. Upon his admission to Baptist, Carmichael was diagnosed with a gastric ulcer and other physical ailments and was prescribed the drug Reglan. ***Id.*** at 694. The night before his discharge, he became agitated and aggressive. ***Id.*** His mother told his treating internist that Carmichael did not want to be discharged because he had said that one of the medications had made him crazy, but the internist discharged him anyway. ***Id.*** At the follow-up appointment four days later, Carmichael's mother complained to the internist that Carmichael had said his medications were making him crazy. Nonetheless, the internist wrote him another prescription for Reglan. ***Id.*** Two days later, after telling a friend that he was tired of living, Carmichael committed suicide. ***Id.*** at 694-95. Truddle filed a wrongful death lawsuit against Baptist and the internist, arguing that Reglan had put Carmichael at a higher risk of suicide. ***Id.*** at 694. The trial court granted summary judgment to the defendants, and Truddle appealed. ***Id.*** at 693.

¶8.      In determining that the trial court properly had granted summary judgment to the defendants, this Court discussed two lines of cases concerning a third party's liability for

6

another's suicide. *Id.* at 695-98. The Court first reviewed the line of cases concerning the irresistible impulse doctrine in Mississippi, originally recognized in *State for Use and Benefit of Richardson v. Edgeworth*, 214 So. 2d 579, 585 (Miss. 1968). *Edgeworth* was a suit for the wrongful death of Billy Joe Edgeworth, who had committed suicide after having suffered continuous, intense harassment by two justices of the peace who had used the criminal process of the courts wrongfully to collect civil debts. *Edgeworth*, 214 So. 2d at 581, 584. The plaintiff's expert psychiatrist testified that, due to the defendants' actions, Edgeworth had been seized by an irresistible fear of prison that had manifested as an uncontrollable impulse to kill himself. *Id.* at 584.

¶9.     The Court in *Edgeworth* found that a rebuttable presumption exists "that a person will not destroy himself by suicide." *Id.* at 585. Notably, the Court held that the rebuttable presumption does not exist when it is apparent the decedent was insane. *Id.* The Court also recognized cases applying the common law rule barring recovery for suicide because it is considered an "unforeseeable, intervening cause of death." *Id.* at 586. The Court recognized that those cases barred recovery because "suicide is a new and independent agency which breaks the causal connection between the wrongful act and the death." *Id.* But the Court declined to follow those cases, holding that "[w]here a defendant has committed an intentional tort, questions of whether the deceased was induced to take his life by an irresistible impulse and whether the intentional tort was a substantial factor in causing the suicide are ordinarily issues for the jury." *Id.* The Court reversed the directed verdict and remanded for a full trial because a jury could find that the defendants had committed

7

intentional torts that contributed to a "delirium or insanity" which had caused a suicidal impulse in Billy Joe Edgeworth that robbed him of his reason and made it impossible for him to resist. *Id.* at 593, 588.

¶10.    *Truddle* found that, after *Edgeworth*, to recover for a decedent's suicide, the plaintiff must plead and prove that "(1) the decedent was under an 'irresistible impulse' rendering him or her unable to discern the nature or consequences of suicide, and (2) the 'irresistible impulse' was proximately caused by the defendant's intentional conduct." *Truddle*, 150 So. 3d at 696. *Truddle* cited the post-*Edgeworth* case of *Shamburger v. Grand Casino of Miss., Inc./Biloxi*, 84 F. Supp. 2d 794, 798 (1998), in which the United States District Court for the Southern District of Mississippi recognized that, in Mississippi, the irresistible impulse rule provides an exception to the common law rule that suicide is a superseding event that precludes recovery for a wrongful act.

¶11.    In *Shamburger*, Michelle Shamburger alleged that Grand Casino's attempt to collect her husband's $3,000 gambling debt had caused his suicide. *Id.* at 796. Grand Casino argued that suicide is an independent, intervening cause severing the causal nexus between any wrongful acts and the suicide. *Id.* at 798. The district court recognized that, in *Edgeworth*, Mississippi had fashioned an exception to this rule "for intentional conduct resulting in suicide where the tortious conduct produces 'a mental illness resulting in an irresistible impulse to commit suicide.'" *Id.* The district court found that the rule requires the decedent to have acted under a mental illness that rendered him unable to control his faculties or understand the nature and consequences of his actions. *Id.* at 799. Because the plaintiff had

8

not produced expert testimony showing that the decedent's suicide had resulted from an irresistible impulse, nor had she shown that Grand Casino had acted tortiously, the district court granted summary judgment to Grand Casino. *Id.* at 799-800, 803.

¶12.    Truddle also cited *Collums v. Union Planters Bank, N.A.*, 832 So. 2d 572, 574 (Miss. Ct. App. 2002), in which a business owner committed suicide after the bank that had financed his business instigated foreclosure proceedings on the business's account. The Court of Appeals affirmed the grant of summary judgment to the defendant. *Id.* at 579. Applying *Edgeworth*, the Court of Appeals found that, because the evidence showed that Collums had planned his suicide with the objective that his family would receive benefits from his life insurance policies, the plaintiff had not shown he had acted under an irresistible impulse. *Id.* at 578. Further, the Court of Appeals found that the plaintiff had failed to show that the bank had committed an intentional act. *Id.*

¶13.    Unlike *Shamburger* and *Collums*, Truddle's case did not involve an allegation that intentional conduct had caused the decedent's suicide. Rather, Truddle's complaint alleged that the decedent's suicide was the result of medical negligence. The Court recognized Truddle's argument that the common law rule barring recovery for suicide should not apply in a case alleging that medical negligence had caused the death. *Truddle*, 150 So. 3d at 696-97. First, the Court set out the elements of medical negligence. *Id.* at 697. The plaintiff has the burden to prove "(1) the existence of a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) a failure to conform to the required standard; and (3) an injury to the plaintiff proximately

9

caused by the breach of such a duty by the defendant." *Id.* Then, the Court found that nothing in Mississippi case law abrogated the general rule that suicide is "an independent, intervening and superseding event" that breaks the causal nexus between the defendant's wrongful act and the death.[2] *Id.* The Court declared, "this principle extends to medical-malpractice claims." *Id.* As support for this proposition, the Court cited a *per curiam* opinion in *Haney v. River Oaks Hospital*, 2006-CA-00219-SCT (Order, May 17, 2007), in which the Court affirmed the dismissal of a medical negligence suit against a physician alleging the patient had committed suicide after having been released from the hospital over her family's objections. *Truddle*, 150 So. 3d at 697. Applying the law to the facts, the Court in *Truddle* concluded:

> Truddle argues that the side effects of Reglan include depression and suicide, which should have been investigated. But, under Mississippi law, this failure alone is not sufficient to sustain a cause of action for a suicide. In such a case, the plaintiff must show that the defendant committed an intentional act that led to an irresistible impulse to commit suicide in order to prevail.

*Id.*

¶14.    After discussing and applying the rule from *Edgeworth*, the Court in *Truddle* reviewed another line of cases holding that, under certain circumstances, a defendant can be held liable in a negligence action for another's suicide when the defendant assumed a duty

---

[2] The Court recognized that, in the withdrawn opinion of *Young v. Guild*, 2008 WL 4740038 (Oct. 30, 2008), *opinion withdrawn on grant of reh'g, substituted at* 7 So. 3d 251 (Miss. 2009), the Court had held that the irresistible impulse doctrine was inapplicable to a physician or medical provider from whom the decedent sought treatment. The Court noted that, because the opinion was withdrawn and the substituted opinion did not address the issue, "the status of the law in Mississippi remained unchanged." *Truddle*, 150 So. 3d at 696.

10

of care to the decedent. *Id.* at 697-98. Of these, the lead case is ***Mississippi Department of Mental Health v. Hall***, 936 So. 2d 917 (Miss. 2006). Julie Renee Hall was a psychiatric patient at the East Mississippi State Hospital and suffered from several mental illnesses. *Id.* at 921. She fell from a third-floor window during an escape attempt and was seriously injured. *Id.* at 922. On appeal of a judgment in her favor, this Court described the issues as "whether East Mississippi had a duty to prevent Hall from harming herself by attempting to escape through the third-story window and whether that duty was breached." *Id.* This Court adopted the Texas standard of care defining the duty that a hospital owes a patient, specifically, "[a] hospital is under a duty to exercise reasonable care to safeguard the patient from any known or reasonably apprehensible danger from herself and to exercise such reasonable care for her safety as her mental and physical condition, if known, may require." *Id.* at 923 (quoting ***Mounts v. St. David's Pavilion***, 957 S.W. 2d 661, 663 (Tex. Ct. App. 1997)).

¶15.    The Court, noting that Hall had attempted suicide on prior occasions and that her civil commitment order recited that she was a danger to herself and others, found that East Mississippi had a duty to provide a safe environment for people like Hall who could not care for themselves due to their mental illnesses. *Id.* at 926. The Court found that Hall's injury had been foreseeable because hospital employees testified that it was common knowledge that patients would try to escape by climbing out of the hospital's windows. *Id.* at 924. Further, the Court concluded that the circuit court had not erred by finding that East

11

Mississippi had breached the duty of care it owed Hall by failing to monitor her behavior and by keeping safety screens on the windows. *Id.* at 923-24.

¶16.     The Court in *Truddle* also reviewed *Carrington v. Methodist Medical Center*, 740 So. 2d 827, 828 (Miss. 1999), a lawsuit concerning the death of James Wiley Carrington, III, who had been committed involuntarily to the Mississippi State Hospital at Whitfield and had committed suicide at Methodist Medical Center while awaiting transfer to Whitfield. *Id.* at 828. His family filed a complaint alleging that Methodist had failed to comply with the applicable standard of care by failure to provide adequate surveillance, failure to assess Carrington's suicidal ideation adequately, failure to protect Carrington from self-harm, failure to treat him with antidepressant medication, and failure to assess his mental status. *Id.* Methodist asserted that it was immune from suit under Mississippi Code Section 41-21-105. *Id.* The Court held that Section 41-21-105 did immunize "good faith actions taken during the actual commitment process," but did not immunize the hospital against liability for the negligent care alleged in the complaint. *Id.* at 829. In its analysis, the Court found that "[p]ersons deemed incapable of making rational judgments, such that they must be committed, are not to be protected by a lesser standard than reasonable care under the circumstances." *Id.* at 829-30.

¶17.     Another case reviewed in *Truddle* was *Mississippi State Hospital v. Wood*, 823 So. 2d 598, 599 (Miss. Ct. App. 2002), involving a claim that the hospital's breach of the standard of care applicable to its inpatient psychiatric treatment of April Wood was a proximate contributing cause of her suicide. Wood was committed voluntarily to the hospital

12

for drug dependency and depression. *Id.* at 600. After a rules infraction, she was placed in isolation and later informed that her isolation would be extended due to additional misconduct. *Id.* Shortly thereafter, she hanged herself. *Id.* The plaintiff presented expert testimony that the hospital's course of treatment had breached the standard of care because it had focused on Wood's substance abuse problems rather than her depression, despite the fact that Wood had displayed the signs and symptoms of severe depression and had a history of suicide attempts. *Id.* The expert also testified that the hospital had breached the standard of care by failing to place Wood under frequent observation. *Id.* The Court of Appeals affirmed the bench verdict for the plaintiff because nothing suggested the trial court manifestly had erred in accepting the expert's testimony that the hospital had breached the standard of care "in a manner that substantially increased the likelihood that April Wood would have both the opportunity and a compelling psychological impulse to do harm to herself." *Id.* at 601.

¶18.    The Court in *Truddle* also reviewed *Lyle v. Johnson*, 240 Miss. 154, 159, 126 So. 2d 266, 267 (1961), in which a patient committed to a private sanitarium by her family left the building and committed suicide by drowning in a lake. Her relatives sued the sanitarium's owner, alleging that the sanitarium had breached the standard of care by failing to provide adequate surveillance of the patient. *Id.* at 160, 126 So. 2d at 268. The jury returned a verdict for the defendant. *Id.* at 159, 126 So. 2d at 267. On appeal, the Court determined the duty owed by the sanitarium to the patient, holding that "[t]he degree of care exacted of a private institution toward their patients is, under the general law, 'such reasonable care and attention

13

for their safety as their mental and physical condition, if known, may require.'" *Id.* at 161, 126 So. 2d at 268. The Court found that the contract between the patient's family and the sanitarium had not required that the sanitarium render a level of care higher than ordinary care, and that the evidence before the jury conflicted on whether the sanitarium had breached the duty of ordinary care by not monitoring the patient more closely. *Id.* at 162, 126 So. 2d at 269. Therefore, the Court affirmed the defense verdict. *Id.* at 164-65, 126 So. 2d at 270.

¶19. ***Truddle*** found these cases recognizing liability for the negligent failure to prevent another's act of self-harm distinguishable because each case had involved a patient committing suicide or injuring himself or herself in the custody and control of the facility; and, in some of the cases, the decedent had communicated a desire to harm himself or herself. *Id.* The Court stressed that these cases were inapplicable because Carmichael never had communicated to hospital employees that he had a desire to harm himself or that he was considering suicide. *Id.* Further, Carmichael had been at home for several days and was not in the custody or control of the hospital at the time of his suicide. *Id.* at 698. Thus, the Court in ***Truddle*** held that "[t]he Mississippi cases Truddle cites for her argument that Mississippi recognizes a defendant's liability for another's suicide because he or she owed the defendant a duty of care are inapposite to the facts of this case." *Id.* The Court further found that, "[i]n those cases, the defendants had the ability to control the patient's conduct, whereas here, Baptist and [the internist] did not." *Id.*

¶20. The dissent argues that the duty of care identified in ***Truddle*** and ***Hall*** applies only in civil commitment cases and to inpatient psychiatric facilities. But ***Truddle*** never said that

14

the duty of care from *Hall* applies only to inpatient psychiatric facilities or civil commitment cases, and not to hospitals such as Singing River that knowingly accept acutely suicidal patients into the hospital for evaluation and treatment. In fact, *Hall* adopted the Texas standard of care, which is applicable to hospitals and inpatient psychiatric facilities alike. *See Harris Hospital v. Pope*, 520 S.W. 2d 813, 815 (Tex. Civ. App. 1975). There is no indication in *Truddle*, *Hall*, or elsewhere in our case law that would limit the applicability of the duty of care articulated in *Hall* to civil commitment cases and inpatient psychiatric facilities. Nor did *Truddle* distinguish *Hall* on the ground that it was not a suicide case. Instead, the key distinction in *Truddle* was that the *Hall* line of cases "involve[d] patients committing suicide or injuring themselves in the custody and control of the facility, and in some cases, the decedent or plaintiff already had expressed a desire to harm himself or herself." *Truddle*, 150 So. 3d at 697-98. In this case, the defendants recognize that this was *Truddle*'s holding by arguing that they had no duty to Randy Vermilyea under *Truddle* because he was not in the hospital's custody at the time of his suicide, but had been discharged.

¶21.    Since *Truddle*, the Court of Appeals decided *Cahn v. Copac, Inc.*, 198 So. 3d 347, 367 (Miss. Ct. App. 2015), holding that a drug treatment facility could be held liable for an inpatient's fatal drug overdose. Ben Cahn was admitted to Copac for the purpose of treatment of his addiction to alcohol and prescription medications. *Id.* at 349. Cahn died of an overdose of Suboxone after he and another patient had purloined that drug from the office of a physician. *Id.* at 353. The trial court granted summary judgment on the plaintiffs' medical malpractice claim, and the Court of Appeals reversed. *Id.* at 348. The Court of Appeals found

15

that, under ***Mississippi Department of Mental Health v. Hall***, ***Mississippi State Hospital v. Wood***, and ***Carrington v. Methodist Medical Center, Inc.***, a hospital has a duty of care to its patients to exercise reasonable care to safeguard them from known or reasonably apprehensible dangers as the patient's mental and physical condition requires, a duty that includes guarding against a foreseeable risk of suicide by patients under the facility's care. *Id.* at 358. The Court of Appeals found that Copac had assumed such a duty to Cahn when it accepted responsibility for his medical care. *Id.* at 361. Further, the Court of Appeals found that it was foreseeable that a patient who was a drug addict would attempt to obtain and abuse controlled substances. *Id.* After finding that Cahn's "wrongful conduct" of stealing the controlled substance did not bar recovery, the Court of Appeals found genuine issues of material fact on whether Copac's negligent storage of Suboxone in the office, in violation of the controlled substances law, proximately had caused his death. *Id.* at 365.

¶22.    We recognize that the parties cite ***Irby v. Madakasira***, 2017 WL 1164219, *5 (Miss. Ct. App. March 28, 2017), in which the Court of Appeals found that a complaint alleging a psychiatrist's acts had created an irresistible impulse that led an outpatient to commit suicide, was time-barred under the one-year statute of limitations applicable to intentional torts. The Court of Appeals also held that, under ***Truddle***, claims of medical negligence were not cognizable because the decedent was not under the custody or control of a physician or facility. *Id.* But, because a motion for rehearing has been filed in *Irby*, and the decision is subject to modification on rehearing, the case, at this point, has no precedential value. *See* M.R.A.P. 40(a).

16

¶23. Having discussed the pertinent case law, we turn to its application to this case. The defendants argue that, because Vermilyea's amended complaint is grounded in medical negligence and does not allege that Randy Vermilyea committed suicide either (1) while in the defendants' custody, or (2) under an irresistible impulse, proximately caused by the defendant's intentional conduct, that rendered him unable to discern the nature and consequences of suicide, the complaint fails to state a claim upon which relief may be granted. We reject this argument.

¶24. The plaintiffs agree with the contention of the defendants that they have not framed their claims under the irresistible impulse doctrine. Instead, Vermilyea argues that, as in *Hall*, *Carrington*, *Wood*, and *Lyle*, the amended complaint stated a claim for medical negligence. We agree. While *Truddle* held that the principle that suicide is an intervening, superseding cause that breaks the causal connection between the wrongful act and the death applies in medical negligence cases, the case also recognized precedent holding that liability exists if the plaintiff shows that the defendant owed the decedent a certain duty of care and breached that duty. Specifically, *Truddle* recognized that, if the decedent was under the custody and control of a facility, then the facility and treating medical care providers can be held liable for a breach of the duty of care that proximately caused or contributed to the decedent's suicide.

¶25. This case is analogous to the medical negligence cases cited in *Truddle*. As in those cases, the defendants were on notice that Randy Vermilyea was suicidal. They specifically accepted him for treatment for being suicidal and depressed. In fact, they accepted Randy

17

Vermilyea for treatment after he had been transported to the hospital by sheriff's deputies who had thwarted his attempt to jump to his death from the Pascagoula River Bridge. Therefore, under **Hall**, they assumed a duty toward Randy Vermilyea to exercise reasonable care to safeguard him from the known danger he presented to himself, and to exercise such reasonable care for his safety as his mental condition required. **Hall**, 936 So. 2d at 923. It was foreseeable that, if the hospital and its staff failed in their duty by releasing Randy Vermilyea without adequate treatment and care, he would resume his attempt to take his own life. Had the hospital and its staff properly performed an adequate suicide risk assessment, and thereby discovered Randy Vermilyea's true state of mind, they could have initiated civil commitment proceedings in the event that Randy Vermilyea refused treatment. *See* Miss. Code Ann. § 41-21-65(2) (Rev. 2013) ("any interested person" may initiate civil commitment proceedings); **Bass v. Parkwood Hosp.**, 180 F.3d 234, 239 (5th Cir. 1999) (hospital staff initiated civil commitment proceedings of apparently mentally ill patient). Taking the allegations of the amended complaint as true, the defendants negligently failed to perform an adequate suicide risk assessment and then negligently discharged Randy Vermilyea from the hospital on his own, without shoes, and without notifying any of his relatives of his suicide attempt.

¶26.    The defendants argue that the fact that Randy Vermilyea's suicide occurred when he was outside the hospital's custody is fatal to his claim. They contend that **Truddle** stands for the proposition that the decedent must have been under the custody and control of the facility at the time of the death or there can be no liability for a suicide allegedly caused by medical negligence. The dissent takes this position as well. Considering the specific facts alleged in

18

the amended complaint, we disagree. Just as in *Lyle*, in which the decedent escaped from the facility and then killed herself, Vermilyea's complaint is that the decedent was in the facility's custody and control, but the defendants negligently discharged him from the facility, proximately causing his immediate suicide. Here, suicide was the very thing that his hospitalization was supposed to prevent. The hospital and its staff, by undertaking treatment of the acutely suicidal Randy Vermilyea, assumed a duty of care toward him and it was foreseeable that a breach of that duty could result in his swift death from suicide. Negligently discharging a suicidal patient and leaving him to his own devices is not materially different from failing to provide a safe environment inside the facility.[3]

¶27.    This case is distinguishable from the medical negligence alleged in *Truddle*. Unlike *Truddle*, in which the suicide occurred days after the patient's discharge, Randy Vermilyea committed suicide "minutes" after he was turned out of the hospital. And, also unlike *Truddle*, because Randy Vermilyea was admitted to the hospital and treated for being suicidal, the facility and its staff were very much on notice of his mental condition. Finally, and also unlike *Truddle*, where the plaintiff's claim was that the physician should not have

---

[3] The defendants also rely on the order in ***Haney v. River Oaks Hospital***, 2006-CA-00219-SCT (Order, May 17, 2007), the *per curiam* affirmance of the grant of summary judgment to a doctor and hospital in a case alleging medical negligence in which the patient committed suicide after being released from the hospital over the family's objection. Vermilyea argues that ***Haney*** is distinguishable because, as shown by the briefs in that case, the decedent had been hospitalized for an anxiety attack, not a suicide attempt. But because ***Haney*** was a *per curiam* opinion, the facts of the case and the Court's reasoning are unknown. *See* M.R.A.P. 35-A ([t]he Court, with the concurrence of all justices participating . . . may affirm the action of the trial court without rendering a formal opinion when an opinion would have no precedential value . . . ."). Therefore, we decline to construe ***Haney*** to bar recovery in this case.

19

prescribed a drug that the decedent had complained was "making him crazy," here the plaintiffs' claim rests upon the negligent discharge of an acutely suicidal patient.

¶28.    For these reasons, we hold that the plaintiffs did present a claim of medical negligence regarding the death of Randy Vermilyea. Regarding Julie Vermilyea Kasby's claim for intentional infliction of emotional distress, the defendants admit that the amended complaint actually described this claim as one of negligent, not intentional, infliction of emotional distress. But they argue that the claim fails because it is wholly dependent upon Vermilyea's claim of medical negligence, which they contend must be dismissed. As discussed above, the medical negligence claim was not subject to dismissal under Rule 12(b)(6). And, although the amended complaint mislabeled the claim as one of intentional infliction of emotional distress, the amended complaint indeed stated a claim of negligent infliction of emotional distress. *See **Sanderson Farms, Inc. v. McCullough***, 212 So. 3d 69, 74 (Miss. 2016) (holding that, when construing allegations of a complaint, "substance prevails over form").

## CONCLUSION

¶29.    Because the amended complaint stated negligence claims for the death of Randy Vermilyea, this Court affirms the trial court's denial of the motion to dismiss and remands this case to the Jackson County Circuit Court for further proceedings.

¶30.    **AFFIRMED AND REMANDED.**

**WALLER, C.J., KING, CHAMBERLIN AND ISHEE, JJ., CONCUR. MAXWELL, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN AND BEAM, JJ.  RANDOLPH, P.J., NOT PARTICIPATING.**

**MAXWELL, JUSTICE, DISSENTING:**

¶31.     There is no dispute that what happened to the Vermilyea family was tragic—that much is without question. But our duty as an appellate court, reviewing the dismissal of their related lawsuit, is to specifically answer whether it is *actionable* under our current law. And after review, I find that it simply is not. This court made very clear in ***Truddle*** that in *Mississippi* allegations of medical negligence are "not sufficient to sustain a cause of action for suicide." ***Truddle v. Baptist Mem'l Hospital-DeSoto, Inc.***, 150 So. 3d 692, 697 (Miss. 2014). Instead—as Chief Justice Waller explained when authoring the ***Truddle*** majority— "[i]n such a case, the plaintiff must show that the defendant committed an intentional act that led to an irresistible impulse to commit suicide in order to prevail"—something the Vermilyeas have not alleged occurred. ***Id.***

¶32.     Despite this, the majority holds ***Truddle*** does not apply. Instead, the majority imposes the same duty as in ***Mississippi Department of Mental Health v. Hall***, 936 So. 2d 917 (Miss. 2006). I find this approach problematic. The first problem with the majority's reliance on ***Hall*** is that ***Hall*** was not a suicide case. And the second and more important difference is that, unlike this case, ***Hall*** involved a patient civilly committed to a state psychiatric hospital. So the duty that hospital owed that patient was one "statutorily mandated" under Mississippi Code Section 41-21-102. ***Hall***, 936 So. 2d at 922. Furthermore, the standard adopted in ***Hall*** was aimed directly at defining the scope of those particular statutory duties. *See **id.***

¶33.     The same is true for ***Carrington v. Methodist Medical Center, Inc.***, 740 So. 2d 827 (Miss. 1999), and ***Mississippi State Hospital v. Wood***, 823 So. 2d 598 (Miss. Ct. App. 2002).

21

In those cases, the patients did commit suicide. But, as in *Hall*, the patients' self-harming acts occurred *while they were civilly committed*. So the hospitals in each case owed the same statutory duties under Section 41-21-102.[4]

¶34. On a similar note, the other cases the majority cites, *Lyle* and *Copac*, involved inpatient treatment by private facilities—private facilities that *expressly assumed* the duty to provide custodial care of clients they knew posed a danger to themselves. *Lyle v. Johnson*, 240 Miss. 154, 160-62, 126 So. 2d 266, 268-69 (1961) (addressing the plaintiff's claim that a private sanitarium owed her mother heightened duties based on the admission contract); *Cahn v. COPAC, Inc.*, 198 So. 3d 347, 361 (Miss. Ct. App. 2015) (noting an inpatient drug-treatment facility, though "not obligated to admit or provide medical care and treatment," "assumed this obligation when it accepted payment and admitted him to the facility").

¶35. *Truddle* recognized custodial control as the key distinction. Just as in this case, the wrongful-death beneficiary in *Truddle* argued that *Hall*, *Carrington*, *Wood*, and *Lyle* all supported the hospital's potential liability for the alleged role medical negligence played in her son's suicide, which he committed after he was discharged. But this Court recognized her reliance on this line of cases was misplaced, because "the cases [she] cited involve[d] patients committing suicide or injuring themselves *in the custody and control of the facility*[.]" *Truddle*, 150 So. 3d at 697-98 (emphasis added).

---

[4] In fact, the sole issue in *Carrington* was whether the defendant hospital was immune under the civil-commitment act. *Carrington*, 740 So. 2d at 828 ("We granted the petition for writ of certiorari to address a question of broad public importance in regard to the proper interpretation of Miss. Code Ann. § 41-21-105 (1993), which governs liability for actions taken during commitment of patients for mental treatment.").

¶36. The majority here concedes that Randy was not in the custody and control of the hospital when he committed suicide. And yet it still insists *Truddle* does not apply. While the majority likens this case to *Lyle*, unlike the sanitarium patient in that case, there is no allegation Randy "escaped" from the hospital and committed suicide. Instead, the complaint alleges Randy committed suicide after being released following treatment.

¶37. I do sympathize with what the majority is doing. In the face of such tragedy, speculation easily arises about what might have been prevented had the hospital assumed custody and control of Randy and forcefully kept him in its care. But wishing the hospital had assumed custody and control, in light of what happened after his discharge, does not give rise to a duty on the hospital's behalf. Nor is it a sound legal reason to create a new duty to assume custody and control—which is essentially what the majority does.

¶38. Based on the facts as alleged in the complaint, Randy was not under the custody and control of the hospital when he committed suicide. So *Truddle* applies. And *Truddle* emphasizes that, even if the hospital was negligent in its treatment of Randy, "this failure alone is not sufficient to sustain a cause of action for a suicide." *Truddle*, 150 So. 3d at 697.

¶39. Therefore, based on our current precedent, I dissent.

**COLEMAN AND BEAM, JJ., JOIN THIS OPINION.**